## JAMES J. BORDERS *et al.*

### *v.*

## WILLIAM K. MURPHY.

1. DECREE—*when not binding on party.* A person not made a party.to a proceeding for partition, and who is not served with process, and who does not enter any appearance, is not bound by any decree rendered therein, and his interest or title in the premises will not be affected in the least.

2. To bind a party by judicial sentence, he must be made a party to the proceeding, and must have either actual or constructive notice thereof, or enter his appearance.

3. ATTACHMENT—*service or levy essential to jurisdiction.* In an attachment before a justice of the peace, where there is no personal service upon the defendant, or levy upon his property, and notice, as required by statute, the justice will have no jurisdiction to adjudicate and render judgment, and any judgment rendered will be a nullity.

4. REDEMPTION—*under void judgment confers no title.* Where a party redeemed land from a sale under an execution issued upon the transcript of a justice's judgment, in a case where the justice had no jurisdiction, and acquired a sheriff's deed on a sale under his execution, it was *held,* that the sale was a nullity, and passed no title whatever, but that the redemption money having been accepted, destroyed the prior sale and left the title to the land in the original owner.

5. LIMITATION—*must be pleaded, if relied on.* No rule of practice is more firmly settled, than that, to render the Statute of Limitations availing as a defense, it must be set up and relied on by the pleadings; and this rule applies equally in equity and at law.

6. SPECIFIC PERFORMANCE—*contract to convey land in consideration of acts done enhancing value of residue.* If the equitable owner of land agrees to convey an interest therein, subject to the approval of the holder of the legal title, to another, if the latter will build a depot and side track near the same, and such party does build the same, at his own expense, with the knowledge of the holder of the legal title, whereby the value of the tract is greatly enhanced, a court of equity will enforce the contract, subject to the rights of the holder of the legal title for any sum due him.

APPEAL from the Circuit Court of Perry county; the Hon. AMOS WATTS, Judge, presiding.

6—78TH ILL.

Mr. EDWARD V. PIERCE, and Mr. E. B. RUSHING, for the appellants.

Mr. GEO. W. WALL, and Mr. LEWIS HAMMACH, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

Appellee filed his bill in the Perry circuit court, against appellants, for the partition of 80 acres of land, of which John Osborn, in 1854 or 1855, died seized. At his death, he left surviving him a widow, since deceased, and four children : William and Henry, his sons, and Martha and Mary J., his daughters. The latter married Archibald Beggs.

It is admitted that Samuel Montgomery is the owner of an undivided one-fourth of the entire tract; that Absalom and Moore H. Wilson own another one-fourth, in which their mother has dower. Appellee claims an undivided fourth, but his title is disputed; and appellee claims that Magill owns the remaining fourth, subject to the equitable title of appellee, of six and a half acres, and the incumbrance of an equitable mortgage, held by Borders.

It also appears that, in July, 1858, on a petition for partition, filed by Magill against all of the heirs of John Osborn, deceased, except William, a decree for partition was rendered, and a partition was made and subsequently approved. Prior to that time, the dower of the widow had been assigned, under a decree rendered in a proceeding had for the purpose, and although William was not, in any manner, a party to the decree of July, 1858, or the petition therein, it is urged that he is bound by that decree.

It is further insisted, that Wm. Osborn's interest was sold and conveyed, under execution sale and sheriff's deed, under an execution from the Perry circuit court. It appears that M. G. Maxwell, as administrator of John Osborn, deceased, recovered a judgment against Wm. Osborn and Wm. Gamble, for $219.75, and under an execution issued on that judgment

William's interest in this land was sold and bid off by the administrator; and after the expiration of twelve months thereafter, and within fifteen months, one Samuel Halliday commenced an attachment suit, before a justice of the peace, against Wm. Osborn, who had gone out of the State, but neither found property to levy upon nor procured service upon him, but the justice of the peace rendered judgment against him for $49. Halliday afterwards procured a transcript from the docket of the justice of the peace, and filed it in the office of the circuit clerk of Perry county, and sued out execution, and placed it in the hands of the sheriff; paid to him the requisite sum to redeem from Maxwell's sale; caused the land to be levied upon, and on a sale he became a purchaser, and received a certificate of purchase, and, no redemption having been made, he received a sheriff's deed. He afterwards sold to Archibald Beggs, who had married one of the daughters of John Osborn, deceased, who then held another fourth of the land. Halliday took back a mortgage of not only the interest he had sold to Beggs, but also the interest his wife held in the premises, to secure the purchase money. Subsequently Halliday foreclosed this mortgage, and purchased in the property at a master's sale, and received a certificate of purchase. This he assigned to J. J. Borders, who was acting for David Magill; and it appears that Borders was to give Magill time to repay him the money, with interest. Magill had paid, perhaps, about $50 towards the redemption, he having previously purchased of Beggs. Borders subsequently obtained a deed, under his purchase, from the master in chancery.

It appears that Magill was in possession of one-half of the premises not occupied by the widow of John Osborn, deceased, which had been assigned to her under decree. He also read in evidence tax receipts for the years from 1862 to 1870, inclusive, for the taxes on a part of the land, under his plea of the Statute of Limitations.

It likewise appears that, in May, 1871, Magill and wife entered into an agreement with appellee, that if he would erect a depot building in the town of Swanwick, which adjoined this land, and have a side track laid, and have the 26 acres on the south side of the south-west quarter of the north-west quarter of section 22, town. 4 south, range 4 west of the third principal meridian, laid off and platted into town lots, they would convey to him the undivided half of the undivided half of that tract of land. He built, at his own expense, the depot, at a cost of $1000, procured the side track to the railroad to be put in, and surveyed and made the town plat at his own expense, as agreed, but Magill refused to make the conveyance. Appellee, before filing his bill, purchased and received from Wm. Osborn a conveyance of all his interest in the 80 acres in controversy.

On a hearing, the court below found that appellee owned the interest of Wm. Osborn, and was entitled in equity to six and one-half acres of Magill's interest in the land ; that Sam'l Montgomery owns an undivided one-fourth of the tract ; that Absalom Wilson and Moore H. Wilson are each seized of an undivided one-eighth part, subject to the dower of their mother, Rose Ann Wilson ; and that Magill is seized of an equitable title to one-fourth, subject to the claim of Borders for the money he has expended in purchasing the certificate of sale by the master in chancery, and of the equitable title to one-fourth of the 26 acres, under their agreement, which is also subject to Borders' equitable mortgage. The court ordered a partition of the premises according to the rights of the several parties, and the assignment of dower, and appointed commissioners to carry the decree into effect.

The commissioners made their report of the partition and assignment of dower made by them. Thereupon, appellants filed exceptions to the report, which being overruled, the report was confirmed. From these decrees defendant Borders appeals, and assigns error on the record.

The record shows that the bill was taken as confessed against Samuel Montgomery, Jane Osborn, the widow of John Osborn, deceased, and Rose Ann Wilson.

Was William Osborn barred or in anywise affected by the decree and proceedings in partition, had in October, 1854? There is no pretense that he was named in or made a party to that proceeding. He had no opportunity to be heard or have his rights determined. He was not called on to show whether he had rights or not, and, if so, what they were. It is a fundamental principle of justice, recognized and acted upon by all courts, that a party can not be deprived of or his rights be affected without having an opportunity to assert and defend them. Hence, to bind a party by judicial sentence, he must be made a party to the proceeding, and must be served with actual or constructive notice of the proceeding, or enter his appearance. It is believed no decision can be found of any respectable court, which announces a contrary doctrine. It would be repugnant to every principle of justice, and contrary to all of the adjudications of the past, to so hold. He, not being a party to that proceeding, is in no sense or manner bound by it, nor was his interest in this land in the slightest degree affected thereby; and he or his assigns are perfectly free to assert his title, at all times and in all places, as though the decree and partition had never been had.

The attachment proceeding by Halliday against him is governed by the same principle. There is no pretense that he was served in that proceeding. The judgment was rendered without authority and in violation of law. Had there been a levy on property, and notice given as required by the statute, then the justice would thereby have acquired jurisdiction over the property, so as to have authorized him to hear evidence to determine whether the plaintiff's claim was just, and, if he so found, render a judgment ordering the sale of such property. But to render a valid and binding personal judgment there must be service on the defendant, as required by the statute, or an appearance entered. There being no

such service or appearance, the judgment was wholly unauthorized and absolutely void, and under which no legal or binding act could be done or right acquired.

This judgment, then, being a nullity, Halliday had no legal right to file a transcript of it in the circuit court, nor had the clerk any legal right to issue an execution on it, nor could the sheriff legally execute it. The judgment being void, all proceedings based upon or had under it were equally void. This being true, Halliday could not legally redeem under it, nor could the sheriff execute it by levy and sale of the property of Wm. Osborn, and the purchase by Halliday was also void, as well as the deed he subsequently obtained from the sheriff. All these proceedings, including the rendition of the judgment, and the sheriff's deed, and all intermediate steps, were void, and conferred no rights on any one, nor did they affect the rights of Wm. Osborn or deprive him of any. They were as though they had never been performed.

Notwithstanding the execution, levy and sale were void, still, inasmuch as the purchaser received the redemption money, his act in thus receiving it operated to extinguish the sale and relieve the lands from the incumbrance of his sale and purchase. Had he, however, refused to receive the money, he could have compelled the sheriff to make him a deed for the land thus sold, notwithstanding the subsequent sale and the purchase by Halliday. See *Brown* v. *Parker*, 15 Ill. 307. This, then, left the title in Wm. Osborn as it was before any sale was had.

As there was some evidence introduced as to possession and payment of taxes by Magill under the deed he received from Beggs, we have turned to and examined with some care the transcript of the record ; but that search has not enabled us to find that the bar of the statute was set up by plea, answer or otherwise. It is not to be found in either of the answers, or separately pleaded, so far as the record discloses, and as it is not set out or referred to in the abstract, we presume that no such defense was interposed by the pleadings.

There is no rule of practice more firmly settled and adhered to, than, to render the bar of the Statute of Limitations availing, it must be set up and relied upon by pleading.    This is true both at law and in equity.    As the statute was not so relied on in this case, it would be useless to discuss that question.    In fact, appellant does not seem to urge it in argument, but simply refers to the evidence.

A careful examination of the evidence shows, we think, that Borders holds the title he acquired under the master's sale as a security for the money he advanced to procure the assignment of the certificate, and that the equitable title was in Magill only subject to the payment when he entered into the agreement with complainant ; that he had, at that time, power to sell it, subject to that incumbrance.    Hence the agreement was valid and binding.

Even if the contract could be held only binding on the approval of Borders, which we are unable to admit, still Magill was to see him and learn whether he approved it.    He admits that he gave complainant no notice that Borders disapproved of the arrangement for about three months afterwards, and after complainant had built the depot, procured the construction of the side track, and platted the ground.    To permit him and Borders to lie by whilst appellee was making such improvements, incurring large expense, and thus greatly enhancing the value of the land, and then allow them to reap all of the benefits, would be rank injustice, that no court should suffer, unless restrained by unswerving rules of law. We are clearly of opinion that they are estopped to rely upon this as a ground for holding the contract invalid, even if it could have been so held had timely notice been given, and, under the evidence, the court did right in finding it valid and binding.

We perceive no error in this record, and the decree of the court below must be affirmed.

*Decree affirmed.*